**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ISABELLA BUNOSSO,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:25-cv-936** |
| | : | |
| **v.** | : | **Hon.** |
| | : | |
| **THE OHIO STATE UNIVERSITY;** | : | |
| **THE OHIO STATE UNIVERSITY** | : | |
| **BOARD OF TRUSTEES; and PETER** | : | |
| **MOHLER, WALTER CARTER, JR.,** | : | |
| **MELISSA GILLIAM, KARLA** | : | |
| **ZADNIK, RAVI BELLAMKONDA,** | : | |
| **SELIN MALKOC-GOODMAN,** | : | |
| **JOSEPH GOODMAN, REBECCA** | : | |
| **RECZEK, GREG ALLENBY, and** | : | |
| **MELISSA MAYHAN, personally and** | : | |
| **in their official capacities;** | : | |
| | : | |
| **Defendants.** | : | |

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff ISABELLA BUNOSSO, by and through her attorneys, ABDNOUR WEIKER LLP, hereby files the following complaint for sex discrimination and retaliation and violations of her constitutional rights in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.*; the First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983; and the Ohio Civil Rights Act, O.R.C. 4112.01, *et seq.*; against Defendants as captioned above.

## INTRODUCTION

1. Isabella Bunosso is an exceptionally talented and promising student currently enrolled in The Ohio State University's ("OSU") Max M. Fisher College of Business's Business

1

Administration Marketing PhD program (the "Program"). In her time at OSU, Ms. Bunosso has dedicated countless hours to the research of Consumer Behavior. She has co-authored and published articles in *Scientific American* and the *International Journal of Consumer Studies.* She has chaired two symposia, has been selected to chair a third symposium in October 2025, and presented her research in numerous forums across the United States. Her excellence also extends to her mentorship and tutelage, serving as both a teaching associate and an independent instructor in the Fisher College of Business. She was nominated for the Graduate Associate Teaching Award for the 2024-2025 academic year; selected as a fellow for the 2025 Hayes Advanced Research Forum; selected as a fellow for the 2025 Haring Symposium for Doctoral Research in Marketing; and was selected as a fellow for the 2025 AMA-Sheth Doctoral Consortium.

2.  Ms. Bunosso's high level of academic performance and professional promise have been consistently commended at every stage of her academic career, earning her accolades for her work quality, breadth of knowledge, and talent. Following her Candidacy Exam in November 2023, Dr. Grant Donnelly wrote, "Congratulations – the Committee was extremely impressed with your answers and knowledge that you shared with us today, and we have all agreed to mark that you have satisfied the qualifying exam requirements. You are now officially a doctoral candidate!" Following her dissertation proposal in May 2024, Dr. Donnelly wrote, "Congratulations on successfully defending your dissertation proposal. The committee thought it was acceptable as is for defense…Overall, excellent work, and congratulations!" Ms. Bunosso's Year 4 Annual Review evaluation noted that, "Isabella is a strong theorist with a talent for conceptualizing variables and positioning a

research question and argument. She has many promising projects to continue pursuing this next year. Her teaching evaluations are very high."

3.  In addition to high praise from faculty, Ms. Bunosso also received overwhelmingly positive comments on her teaching evaluations from her students. "Best teacher ever," "One of the best professors that I have had in Fisher, genuinely cared for us and did a fantastic job," "My favorite professor at Ohio State so far," "She was an excellent professor…Overall no complaints or areas of concern," "Professor Bunosso did an excellent job setting us up for success by doing a very thorough job making sure we understood the material through understandable and relevant examples in class, and by putting the concepts into practice through in-class activities and out-of-class assignments," "She often gives examples on certain theories that would be vague without them," "We understood the material through understandable and relevant examples," "I love how she provided up-to-date examples of marketing," "Isabella was great. I enjoyed her class on consumer behavior. It was really insightful especially as I continue in my marketing internship," "She was very respectful of the students," and "This class will always be remembered because this was the class I did my individual presentation confidently!"

4.  These accomplishments would be notable for any PhD student. However, Ms. Bunosso decided to take the brave step of reporting the sex discrimination and abuse she was suffering under her advisor and other senior faculty to OSU's Title IX office, which dragged out the investigations and failed to implement basic supportive measures to protect her from further abuse. As a result, OSU faculty and administrators initiated a relentless campaign to stymie Ms. Bunosso's continued academic progress and ultimately try to force her out of the program.

3

5. Because she has had to put so much time and effort into just trying to fight for her right to report abuse as the law says she may, Ms. Bunosso's achievement of her degree has been delayed by years. The fact that Ms. Bunosso was able ability to accomplish as much as she did in the face of systemic abuse, discrimination, and retaliation from a huge and powerful adversary like OSU makes her achievements extraordinary.

6. Having tried and failed every possible method of seeking accountability within the OSU system, Ms. Bunosso has instead been left continuously exposed to discrimination, harassment, and retaliation. Therefore, she turns now to this Court to seek justice, protection, and the ability to simply finish her degree program in peace and move on with her career, which, if left unchecked, OSU will not allow her to do.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §1331 over Ms. Bunosso's federal and Constitutional claims.

8. This Court has supplemental jurisdiction over Ms. Bunosso's state law claims pursuant to 28 U.S.C. §1367 because the state law claims asserted by Ms. Bunosso form part of the same case or controversy as the federal claims.

9. Venue is proper in the Southern District of Ohio, Eastern Division under 28 U.S.C. §1391(b)(2) and §1391(c), as the claims arise in this District and the Defendants maintain their principal place of business within the district.

## PARTIES

10. At all relevant times, Plaintiff Isabella Bunosso is and was a graduate student attending The Ohio State University and residing in Columbus, Ohio.

4

11. Defendant The Ohio State University ("Ohio State," "OSU," or "University") is and was at all relevant times a public education institution in Columbus, Franklin County, organized and existing under the laws of the State of Ohio.

12. OSU receives federal funding and is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).

13. Defendant OSU Board of Trustees ("Board of Trustees" or "Board") is the governing body of OSU.

14. Defendant OSU and Defendant Board of Trustees are hereinafter collectively referred to as "the OSU Defendants."

15. At all material times, Defendant Peter Mohler, in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

16. At all material times until August 22, 2023, Dr. Mohler was OSU's Acting President and Executive Vice President for Research, Innovation and Knowledge.

17. At all material times from August 22, 2023, Defendant Walter "Ted" Carter, Jr., in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

18. At all material times from August 22, 2023, Mr. Carter has been OSU's President.

19. At all material times until December 31, 2023, Defendant Melissa Gilliam, in her official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of her employment and employer.

20. At all material times until December 31, 2023, Dr. Gilliam was OSU's Executive Vice President and Provost.

21. At all material times, Defendant Karla Zadnik, in her official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of her employment and employer.

22. From January 1, 2024, to January 13, 2025, Dr. Zadnik was OSU's Interim Executive Vice President and Provost.

23. At all material times from January 14, 2025, Defendant Ravi Bellamkonda, in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

24. At all material times from January 14, 2025, Dr. Bellamkonda has been OSU's Executive Vice President and Provost.

25. At all material times, Defendant Anil Makhija, in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

26. At all material times, Dr. Makhija was the Dean of OSU's Max M. Fisher College of Business ("FCB").

27. At all material times, Defendant Selin Malkoc-Goodman, in her official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

28. At all material times, Dr. Malkoc-Goodman was employed by OSU as a professor in FCB where she served as a member of the Business Administration Marketing PhD Program Committee.

29. At all material times, Defendant Joseph Goodman,[1] in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

30. At all relevant times, Dr. Goodman was employed OSU, as an associate professor until May 2024 and a full professor starting in May 2024 in FCB.  Dr. Goodman also served as Chair of FCB's Department of Marketing and Logistics ("the Department" or "DML") until May 2024.

31. At all material times, Defendant Rebecca Reczek, in her official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

32. At all relevant times, Dr. Reczek was employed by OSU as a professor in FCB where she served as a Co-Chair of the Business Administration Marketing PhD Committee and the Berry Chair of New Technologies in Marketing.

33. At all material times, Defendant Greg Allenby, in his official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of his employment and his employer.

34. At all relevant times, Dr. Allenby was employed by OSU as a professor in FCB where he served as a member of the Business Administration Committee at both the FCB level and DML level.

---

[1] Dr. Malkoc-Goodman and Dr. Goodman are married.

35. At all material times, Defendant Melissa Mayhan, in her official capacity, worked within Franklin County, State of Ohio, and was an agent and/or employee of OSU, acting or failing to act within the scope, course, and authority of her employment and her employer.

36. At all relevant times, Ms. Mayhan was OSU's Deputy Associate Vice President and Title IX Coordinator.

## APPLICABLE LAW AND POLICY

37. Pursuant to Title IX of the Education Amendments of 1972 ("Title IX"):

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…

20 U.S.C. § 1681(a).

38. Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106 and 38 C.F.R. Part 23.

39. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court held that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

40. In *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60 (1992) the Supreme Court held that teacher-student sexual harassment is a form of sex discrimination prohibited by Title IX.

41. In *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), the Supreme Court held that retaliation against a person who complains about sex discrimination is also a form of sex discrimination prohibited by Title IX.

42. In *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020), the U.S. Court of Appeals for the Sixth Circuit held that, to state a claim for Title IX retaliation, a plaintiff must show "that (1) she engaged in protected activity, (2) the [school] knew of the protected activity, (3) she suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action."

43. The First Amendment to the U.S. Constitution provides that Congress shall make no law "abridging the freedom of speech." U.S. Const. amend. I.

44. In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), the Supreme Court held that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

45. In *Healy v. James*, 408 U.S. 169 (1972), the Supreme Court held that the First Amendment applies with the same force at public universities as at other educational institutions.

46. In *Diei v. Boyd*, 116 F.4th 637, 645 (6th Cir. 2024), the Sixth Circuit adopted the following test to assess claims of First Amendment retaliation by students against schools: "(1) was [the student's] speech constitutionally protected? (2) did defendants take adverse actions against [the student] that caused her to suffer an injury that would likely chill a person of ordinary firmness from continuing that speech? and (3) if so, were her rights clearly established?"

47. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

## FACTUAL ALLEGATIONS

### Background Information

48. Ms. Bunosso is currently a PhD candidate in the FCB Business Administration, Marketing program ("the Program") at OSU, with a specialization in Consumer Behavior. She holds a Master of Business Administration degree from FCB and graduated *magna cum laude* with a Bachelor of Business Administration degree from Georgia Southern University's Parker College of Business in 2019.

49. Initially, Ms. Bunosso was scheduled to complete her degree and graduate from OSU in May 2025.

50. Now, due to the actions and inactions of OSU employees as described in this Complaint, she hopes to complete her degree by May 2027.

51. Ms. Bunosso was admitted to the Program in March 2021 to start classes as a student and work as a Graduate Research Associate ("GRA") in August 2021.

52. Upon Ms. Bunosso's acceptance into the Program, Dr. Rebecca Reczek, one of the Program co-chairs, assigned Dr. Selin Malkoc-Goodman and Dr. Grant Donnelly as Ms. Bunosso's advisors.

53. Throughout her time in the Program, Ms. Bunosso worked on several projects which demonstrated her passion for research in Consumer Behavior as well as her desire to ensure that she was competitive on the job market through her work on multiple projects.

54. Ms. Bunosso's "*Consumer Response to Politicized Business Operations*" project ("the Political Policies project") explores how consumers interpret seemingly neutral business operations as signals of a company's political identity and agenda.

55. At the outset, Ms. Bunosso led the Political Policies project as first author while more senior faculty were relegated to second and third author. Dr. Donnelly was second author. Dr. Malkoc-Goodman was third author.

56. Ms. Bunosso's "*Experiential Materialism or Consuming Experiences in a Materialistic Way*" project ("the Experiential Consumption project") sought to challenge conventional wisdom that experiential consumption is inherently better than material consumption by introducing the concept that people can approach experiences with materialistic, externally motivated values.

57. In January 2022, Ms. Bunosso began leading the Experiential Consumption project as first author while, again, senior faculty were relegated to second, third, and fourth author. Dr. Jesse Walker was second author. Dr. Malkoc-Goodman was third author, and Dr. Goodman was fourth author.

**Ms. Bunosso's Reports of Sex Discrimination and Retaliation by the Defendants to OSU**

58. From March 29, 2021, prior to Ms. Bunosso formally starting the Program, through January 2023, Dr. Malkoc-Goodman and Dr. Goodman repeatedly discriminated against and harassed Ms. Bunosso based on her sex.

59. From 2021 to 2023, Ms. Bunosso reported the discrimination and harassment to Dr. Reczek multiple times.

60. Dr. Reczek did not intervene to prevent continued discrimination and harassment.

61. At no time over the course of the 3 years did Dr. Reczek ever advise Ms. Bunosso of her right to file a Title IX complaint herself.

62. As a result of Dr. Reczek's failure to intervene, Dr. Malkoc-Goodman and Dr. Goodman had free rein to continue abusing and discriminating against Ms. Bunosso unchecked.

63. Eventually, Ms. Bunosso learned about the Civil Rights Compliance Office ("CRCO")[2] CRCO and her right to file complaints with the office.

64. On March 1, 2023, Ms. Bunosso filed a formal complaint alleging sex discrimination and retaliation with CRCO against Dr. Reczek, Dr. Malkoc-Goodman, and Dr. Goodman.

65. CRCO opened an investigation into this complaint.

66. On March 9, 2023, CRCO issued a notice of the following allegations to Dr. Malkoc-Goodman:

> Beginning in August of 2021, Isabella Bunosso reported she has endured "excessive demands, intimidation tactics, humiliation, gaslighting and victim-blaming, derogation, disregard for grievances, absence of corrective actions, and adverse conduct upon reporting grievances and requesting to no longer be managed by an abusive advisor." Isabella reported that this discrimination and harassment is in part, due to her gender and also reported that only one female Consumer Behavior student has graduated from this program since its inception.
>
> Specifically, it was reported you made "impossible and excessive demands and intrude on [Isabella's] life." Examples include, but are not limited to: assigned Isabella at least 80 hours of research work each week "in order to be a successful woman in this field" and stated Isabella should "consider sacrificing personal development and relationships, and consider delaying or forgoing having children." You reportedly required Isabella to work weekends, late into the night, during holidays, and academic recesses. When Isabella questioned your "excessive demands," you became hostile and inflexible, scolded Isabella, and belittled her tasks and skills. It is noted that a senior male student in the program was not expected to work "as excessively" as Isabella. In May of 2022, you stated, "advisors are entitled to treat their students like slaves" while introducing Isabella to a visiting professor.
>
> On August 2, 2021, you stated that Isabella could not wear shorts, above-the-knee skirts/dresses, knee-high boots, or tops that expose her shoulders. When Isabella noted that male students were able to wear shorts and tank tops and had no dress code, you rolled your eyes. Additionally, on August 2, 2021, you stated that the only

---

[2] Previously known as the Office of Institutional Equity ("OIE")

12

students on track were two male students and that Isabella should model her performance on theirs.

In October of 2022, you referenced a "successful collaboration" on a project with a male student to Isabella, stating that you respected and honored the boundaries he set. The following week, Isabella attempted to mimic and "exercised this strategy;" however, Isabella received different results than the male student.

On October 13, 2022, during a presentation for an upcoming conference, when Isabella stated the title of the presentation, you stated that you were "appalled by [Isabella's] audacity to have a voice and use it to object her conduct rather than keeping [Isabella's] mouth shut and complying, as students are meant to do in the program."

Later, in October of 2022, following a conference, you only approved reimbursement for half of Isabella's lodging costs as she was unable to find a roommate; however, male students' lodging costs are covered fully, despite not having a roommate. It was also reported that the male student's expenses who attended this conference were "several hundred dollars more" than Isabella's.

67. Also on March 9, 2023, CRCO issued a notice of the following allegations to Dr. Goodman:

Beginning in August of 2021, Isabella Bunosso reported she has endured "excessive demands, intimidation tactics, humiliation, gaslighting and victim-blaming, derogation, disregard for grievances, absence of corrective actions, and adverse conduct upon reporting grievances and requesting to no longer be managed by an abusive advisor." Isabella reported that this discrimination and harassment is in part, due to her gender and also reported that only one female Consumer Behavior student has graduated from this program since its inception.

It was reported you degraded Isabella in front of her peers and speak differently to Isabella than male students and professors. Specifically, in Fall of 2021, during a seminar that you were teaching, you stated, "you don't know anything yet" and "you don't even know how to talk about things." You then called upon a male student to provide a response and as he provided the "same information" Isabella did, you "praised him" for his aptitude.

On October 17, 2022, following a request from Isabella to her advisor, you confronted Isabella in front of lab employees and undergraduate students and displayed an "outburst of emotions"

toward Isabella regarding her relationship with her advisor, stated that you needed your male student to be there instead of Isabella as she was "useless," and ultimately kicked her out of the lab.

Later, in October of 2022, during a presentation, you failed to mention Isabella's name as a coauthor even though she was the leader of the project, wrote conference submission/proceedings, and created the slideshow that you presented. Following this conference, you only approved reimbursement for half of Isabella's lodging costs as she was unable to find a roommate; however, male students' lodging costs were fully covered despite not having a roommate. It was also reported that the male students' expenses conference were "several hundred dollars more" than Isabella's.

68. Also on March 9, 2023, CRCO issued a notice of the following allegations to Dr. Reczek:

Beginning in August of 2021, Isabella Bunosso reported she has endured "excessive demands, intimidation tactics, humiliation, gaslighting and victim-blaming, derogation, disregard for grievances, absence of corrective actions, and adverse conduct upon reporting grievances and requesting to no longer be managed by an abusive advisor." Isabella reported that this discrimination and harassment is in part, due to her gender. It was also reported that only one female Consumer Behavior student has graduated from this program since its inception and only male students have graduated under your advisorship.

Specifically, due to the "intolerable and inescapable conduct of the program," "each female student" has reported to you thoughts of self-harm or suicidal ideations "as the only end to the mistreatment." You suggested that they take antidepressants and/or anti-anxiety medication as "no changes would be made to the faculty's behavior." You blamed the female students and suggested that they apologize to those who were accused. You also stated, "it is common for women in academia to rely on counseling and antidepressants." On August 11, 2021, you told Isabella that she should model her performance after a male student in the cohort above her and a former male student who recently graduated. You also offered Isabella and another female student "a terminal path out of the program, barring them from earning a Ph.D. degree."

From October 2021 through January 2023, Isabella consistently reported harassment and abuse incidents to you. Due to your personal friendships with the individuals alleged, you "pardoned" their behavior and in regard to one individual alleged, stated it was "because he is like my brother." When Isabella requested a new

14

> advisor, from March through October of 2022, you stated Isabella
> could continue with her current advisor or switch to you as her
> advisor; however, you would require her to restart her program,
> delaying her graduation, and require her to work 65 hours per week
> despite her 20 hour/week contract.
>
> Additionally, in October of 2022, Isabella reported an incident to
> you regarding her advisor, and you stated, "dealing with toxic
> masculinity comes with the territory of being a woman in business
> and academia" and "there is nothing I can or will do about this."

69. On April 17, 2023, Ms. Bunosso filed a CRCO complaint reporting that Dr. Goodman had

    retaliated against her.

70. CRCO opened an investigation into this complaint.

71. On May 4, 2023, CRCO issued a notice of the following allegations to Dr. Goodman:

> Fu[r]ther, on April 5, 2023, Isabella was informed that you
> reportedly inquired as to whether or not she was attending all of her
> classes despite a prior agreement with her supervisor. On April 8,
> 2023, you emailed Isabella and assigned her responsibilities "above
> and beyond any other student" and what was assigned to her by her
> supervisor. On April 10, 2023, you emailed Isabella and provided
> weekly calculations for her hours worked for the Spring 2023
> Graduate Associateship. Additionally, on April 13, 2023, it was
> reported that you asked Isabella's advisor to report what her Spring
> 2023 research activities had been and reportedly told her advisor that
> he could report that she had done nothing. Isabella feels that this is
> an attempt to falsely prove she is failing to fulfill her employment
> and education responsibilities as a result of the original complaint
> submitted to OIE.

72. On May 22, 2023, Ms. Bunosso filed a CRCO complaint reporting that Dr. Malkoc-

    Goodman and Dr. Goodman retaliated against her.

73. CRCO opened an investigation into this complaint.

74. On June 9, 2023, CRCO issued a notice of the following allegations to Dr. Malkoc-

    Goodman:

> In March of 2023, after you were notified of the initiation of an OIE
> investigation, you reportedly updated your CV to exclude Isabella's

15

name from the author list on a project/working paper and "usurped" first authorship. Isabella also reported that you participated in meetings for this project/working paper without her. It was additionally reported that you demoted Isabella from first author to last author on your CV for another project. Isabella reported that removing her as an author on one project and demoting her authorship on another was due to her original formal complaint filed with OIE and is retaliatory.

75. Also on June 9, 2023, CRCO issued a notice of the following allegations to Dr. Goodman:

In April of 2023, after you were notified of the initiation of an OIE investigation, you reportedly updated your CV to exclude Isabella's name from the author list on a project/working paper. Isabella also reported that you participated in meetings for this project/working paper without her. Isabella reported that removing her as an author on this project was due to her original formal complaint filed with OIE and is retaliatory.

76. On or around June 19, 2023, Ms. Bunosso filed an authorship dispute complaint with the University's Office of Research Compliance ("ORC") alleging that Dr. Malkoc-Goodman and Dr. Goodman had engaged in research misconduct by improperly excluding Ms. Bunosso from the Political Policies and the Experiential Consumption projects.

77. On or around June 21, 2023, ORC informed Ms. Bunosso that the authorship dispute complaint fell under the jurisdiction of the Fisher College of Business and was referred to Dean Anil Makhija.

78. Dean Makhija assigned the matter to be reviewed by an internal investigation committee.

79. On August 10, 2023, FCB graduate student Jane Doe[3] filed a CRCO complaint reporting that Dr. Malkoc-Goodman had retaliated against her and Ms. Bunosso as follows:

During my annual review in May of 2023, I was told a Zoom option would be provided for me in order to attend our department brown bag seminars. These are weekly seminars where faculty, potential hires, and students present their research to the marketing department. A Zoom link has always been provided, at least since

---

[3] Jane Doe is another FCB graduate student who filed a Title IX complaint against Dr. Malkoc-Goodman with CRCO.

the start of the pandemic, to allow faculty to attend should they need to remain home or are traveling. On August 25th a junior faculty member sent out a Zoom link to the entire department for our brown bags. Minutes after the email was sent, Dr. Malkoc responded with a "reply all" email, to the entire department, asking why someone would need a Zoom link in the first place and shortly after the individual who sent the link said it was a mistake. This was a targeted retaliatory action on Dr. Malkoc's part for several reasons. First, the Zoom request is a protective measure because I don't feel safe being in the same room as the respondents to the ongoing OIE investigation, but a Zoom still allows me to benefit from the educational opportunity of watching the presentations. Dr. Malkoc wants to deprive me of that educational opportunity or at the very least humiliate me in front of my peers by calling attention to the fact that this is a non-standard request (despite us having used Zoom in the past when faculty have been traveling or sick). She wants to force me to be face-to-face with her in person or I don't get to learn. Second, it will be clear to other faculty and students that I, and Ms. Bunosso who is also involved in the ongoing OIE investigation, are not present during brownbags. We are the only upperlevel students in the department who are not attending so our presence will be clearly noticed. It's obvious who the Zoom link was for and when Dr. Malkoc forced the junior faculty to rescind the email, it was clear who was being targeted. When I requested to attend these meetings via Zoom in May, my committee had no problem with the idea and even supported it because, as previously written, there has always been an option to attend virtually. I believe this is active retaliation against me and a violation of my supportive measures to ensure equal and safe access during the ongoing OIE investigation. This is consistent with Dr. Malkoc's pattern of behavior and previously reported abuse and bullying. Below are screenshots of the email interaction between the junior faculty and Dr. Malkoc. I have marked out the junior faculty's name in order to protect their anonymity but am willing to provide it should that be necessary for the investigation.

80. Upon information and belief, CRCO opened this complaint for investigation and sent a notice of allegations to Dr. Malkoc-Goodman.

81. On or around August 21, 2023, the internal investigation committee assigned to investigate Ms. Bunosso's authorship dispute, issued its recommendations, finding that Ms. Bunosso

had contributed sufficiently to both projects to warrant authorship, despite Dr. Goodman and Dr. Malkoc-Goodman's wrongful attempts to exclude her.

82. The authorship matter was then referred to then-FCB Dean Anil Makhija to determine next steps.

83. On or around August 28, 2023, CRCO filed a complaint on Ms. Bunosso's behalf reporting that Dr. Allenby had retaliated against her.

84. CRCO opened an investigation into this complaint.

85. On August 31, 2023, CRCO issued a notice of the following allegations to Dr. Allenby:

> You encouraged Isabella Bunosso to drop her complaint against Rebecca Reczek and stated that if restoration is not possible, it will impede Isabella's ability to become a professor somewhere. It was also reported that you stated that you were biased against Isabella due to your relationship with Rebecca and the rest of the faculty.

86. On September 11, 2023, Ms. Bunosso filed a CRCO complaint reporting that Dr. Goodman had retaliated against her.

87. On September 13, 2023, Ms. Bunosso filed a CRCO complaint reporting that Dr. Reczek had retaliated against her.

88. On September 18, 2023, Ms. Bunosso filed a CRCO complaint reporting that Dr. Malkoc-Goodman and Dr. Goodman had retaliated against her.

89. CRCO opened an investigation into these complaints.

90. On September 26, 2023, CRCO issued a notice of the following allegations to Dr. Malkoc-Goodman:

> Additionally, it was reported that on September 14 and September 15, 2023, your department hosted the first consumer behavior researcher of the semester. Isabella reported that she and another student who also filed a complaint with OIE were the only students not invited to a breakfast with this researcher on September 15,

2023. Isabella reported that you are the consumer behavior coordinator of these external researcher visits/talks.

91. Also on September 26, 2023, CRCO issued a notice of the following allegations to Dr. Goodman:

> Additionally, beginning in May of 2023, it was reported that Isabella's advisor attempted to arrange a department meeting for approval of Isabella's Program of Study, a pre-requisite to taking the PhD Candidacy Exam. In July, it was reported that you stated a meeting would be scheduled in August; however, it was not. Isabella was later informed that a meeting was scheduled for September 12, 2023; however, Isabella never received official notification of this meeting.
>
> It was reported that no meeting has been scheduled and Isabella's Program of Study is still awaiting approval, despite being submitted for approval in May. This behavior was reported as obstructing Isabella's progress in the program and putting her degree in jeopardy and due to the previous complaints filed with OIE against you. It was also reported that on September 14 and September 15, 2023, your department hosted the first consumer behavior researcher of the semester. Isabella reported that she and another student who also filed a complaint with OIE were the only students not invited to a breakfast with this researcher on September 15, 2023. Isabella reported that your program/department coordinator is "generally" the person who coordinates the schedules/itineraries of these events.

92. Also on September 26, 2023, CRCO issued a notice of the following allegations to Dr. Reczak:

> Further, Isabella reported that since her original complaint, you have reached out to multiple professors within the Fisher College of Business "enlisting them to threaten and intimidate Isabella into dropping her complaint." Specifically, on April 28, 2023, Isabella was asked by other faculty members to consider reconciling her relationship with you and discuss how she could proceed in the PhD program with positive relationships with faculty. On May 8, 2023, an additional faculty member informed Isabella that you asked them to ask Isabella to drop her complaint or it would interfere with Isabella on the job market. On May 17, 2023, another faculty member reportedly informed Isabella that you requested an informal resolution and also stated that this complaint would interfere with Isabella's attempt to obtain a job. Later, on May 31, 2023, another

19

> faculty member informed Isabella that you sought their assistance in
> getting Isabella to drop her complaint against you.

93. Upon information and belief, on or around October 5, 2023, Dr. Malkoc-Goodman and Dr. Goodman filed a CRCO complaint against Ms. Bunosso in retaliation for filing complaints against them.

94. The complaint accused Ms. Bunosso of providing false information to CRCO, failing to fulfill her TA responsibilities and continuing to receive payment from the University, and alleged that she harassed and discriminated against them based on ethnicity, religion, sex, gender and/or national origin.

95. On or around November 15, 2023, CRCO completed its investigation into Ms. Bunosso's complaint against Dr. Allenby, finding him in violation of the Title IX policy for retaliating against Ms. Bunosso.

96. On or around December 1, 2023, Dean Makhija issued his report and recommendations as follow up to the investigation committee's findings in the authorship dispute.

97. Dean Makhija affirmed the investigation committee's findings and recommended that Dr. Malkoc-Goodman and Dr. Goodman "yield in favor of a doctoral student at a beginning stage of career" and recommended the following as resolutions:

   a. Authorship for the Political Policies project to Ms. Bunosso and Dr. Donnelly.

   b. Authorship for the Experiential Consumption project:

      i. If it remained in its original form: authorship to Ms. Bunosso and Dr. Walker.

      ii. If it was revised to remove Ms. Bunosso's research: authorship to Dr. Malkoc-Goodman, Dr. Goodman, and Dr. Walker.

98. On or around December 9, 2023, Dr. Malkoc-Goodman and Dr. Goodman's attorney sent a letter to Ms. Bunosso notifying her that they refused to comply with Dean Makhija's recommendations.

99. The letter demanded that Ms. Bunosso allow Dr. Malkoc-Goodman to remain as coauthor on the Political Policies project and completely walk away from all rights to the Experiential Consumption project.

100.    The letter stated that Dr. Malkoc-Goodman and Dr. Goodman refused to allow Ms. Bunosso to submit, publish, or use either of these projects, including to fulfill any degree requirements, until the matter was resolved.

101.    Losing access to both projects would destroy all opportunity Ms. Bunosso had to graduate with a PhD and find a career.

102.    On or around December 12, 2023, Dean of the Graduate School Mary Stromberger told Ms. Bunosso that the conflict with Dr. Malkoc-Goodman and Dr. Goodman was "toxic."

103.    Dean Stromberger said the Political Policies project was "clearly" Ms. Bunosso's project.

104.    Dean Stromberger said, consistent with university norms, faculty should yield to the student; therefore, Dr. Malkoc-Goodman and Dr. Goodman should yield to her.

105.    To move forward in the Program and to prevent further delay, in her meeting with Dean Stromberger, Ms. Bunosso discussed releasing her claims to the Experiential Consumption project in exchange for Dr. Malkoc-Goodman releasing her claims to the Political Policies project.

106.    Ms. Bunosso felt powerless and was desperate to find solutions that would give her the ability to continue working on at least one project. As a result, she was forced to make unnecessary concessions to prevent Dr. Malkoc-Goodman and Dr. Goodman from continuing to interfere with her degree.

107.    On or around January 5, 2024, CRCO finally issued no-contact directives between Ms. Bunosso and Dr. Malkoc-Goodman, Dr. Goodman, and Dr. Reczek, which Ms. Bunosso had been requesting since she filed her first complaint in February 2023.

108.    On January 22, 2024, CRCO issued a notice to Ms. Bunosso that Dr. Goodman had filed a complaint of discrimination and harassment based on ethnicity, religion, sex, gender, and/or national origin and retaliation against her alleging the following:

> It was reported that you engaged in retaliation against Joseph Goodman and process abuse by providing false information to OIE. Specifically, it was reported that between February and September 2023, you filed several false OIE reports/formal complaints. In addition, in Spring 2023, you refused to fulfill your responsibilities as a TA but continued receiving payment from the University. It was reported that following Human Resources intervention and correction of a clerical error (classification of GTA vs. GRA), you filed an OIE complaint on March 17, 2023, against Prof. Joseph Goodman regarding your work responsibilities.

> Additionally, it was reported that on or around June 2023, you submitted a research ethics violation report regarding Joseph Goodman and authorship attributions. Lastly, it was reported that in or around Fall 2023, you reported conflict of interest concerns regarding Joseph Goodman's involvement in the progression of your candidacy.

> Lastly, it was reported you engaged in harassment and/or discrimination against Joseph Goodman on the basis of ethnicity, religion, sex, gender, and/or national origin.

109.     Also on January 22, 2024, CRCO issued a notice to Ms. Bunosso that Dr. Malkoc-Goodman filed a complaint of discrimination and harassment based on ethnicity, religion, sex, gender, and/or national origin and retaliation against her alleging the following:

> It was reported that you engaged in retaliation against Selin Malkoc and process abuse by providing false information to the Office of Institutional Equity. Specifically, it was reported that between February and September 2023, you filed several false reports/formal complaints against Selin. In addition, around Summer/Fall 2023, you submitted a research ethics violation report regarding Selin. Further, it was reported that on multiple dates spanning Spring 2023 to Fall 2023, you reported a conflict of interest regarding Selin Malkoc's presence on the PhD committee.
>
> Lastly, it was reported you engaged in harassment and/or discrimination against Selin Malkoc on the basis of ethnicity, religion, sex, gender, and/or national origin.

110.     That same day, CRCO dismissed the complaints that Dr. Goodman and Dr. Malkoc-Goodman filed against Ms. Bunosso because "an investigation into the allegations provided that there is no reasonable cause to believe that a policy violation may have occurred."

111.     On or around January 31, 2024, Dean Makhija notified Ms. Bunosso that he had attempted to "mediate a resolution" with Dr. Malkoc-Goodman and Dr. Goodman regarding the Political Policies and Experiential Consumption projects; however, he determined that "it would be better" if the parties worked through it directly through their legal counsel rather than through the University, making it clear that OSU was unwilling to enforce and implement its own findings and recommendations in the authorship dispute.

112.     Because the University refused to intervene despite Dean Makhija's recommendations on authorship, Ms. Bunosso realized she had no choice but to negotiate directly with Dr. Malkoc-Goodman and Dr. Goodman despite the risk it put her at, because

she understood that they would not stop their campaign of retaliation against her and OSU would not protect her, and she would lose all access to both of her research projects and have to start her research from scratch, setting her back years professionally.

113.    On or around April 25, 2024, OSU issued the following sanctions against Dr. Allenby:

    a.   Removal from his position as Co-Director of the PhD Program and any other administrative appointments for five years;

    b.   A prohibition on overseeing Ms. Bunosso's academic progress;

    c.   A prohibition on contacting or communicating with Ms. Bunosso in all other academic settings.

110. Though the University issued sanctions against Dr. Allenby, Ms. Bunosso's allegations against Dr. Reczek, Dr. Malkoc-Goodman, and Dr. Goodman were still unresolved.

114.    On or around May 21, 2024, Ms. Bunosso emailed CRCO and requested that the no-contact directive between her and Dr. Malkoc-Goodman be modified to allow for limited communication concerning the Political Policies project only.

115.    On or around May 23, 2024, CRCO informed Ms. Bunosso that it would review her request and would "follow up" with her.

116.    CRCO never followed up.

117.    On or around June 17, 2024, Ms. Bunosso contacted CRCO again, asking them to modify the no-contact directives against Dr. Malkoc-Goodman and Dr. Goodman to allow for limited communication concerning the Experiential Consumption project as well, to allow for negotiations with them.

118. On or around June 20, 2024, CRCO responded that it would get back to her in early July as both Dr. Malkoc-Goodman and Dr. Goodman were out of the country until then.

119. On or around June 26, 2024, Dr. Goodman excluded only Ms. Bunosso from an email with an exclusive link for the entire Consumer Behavior faculty with information pertaining to the hotel for the upcoming Society for Consumer Psychology conference.

120. On August 28, 2024, Ms. Bunosso finally reached an agreement with Dr. Malkoc-Goodman and Dr. Goodman that would allow her to continue working on the research projects she had started which they had tried to take from her.

121. This agreement allows Ms. Bunosso to continue her work on the Political Policies project.

122. While the agreement allows for the possibility for Ms. Bunosso to receive authorship credit and the ability for Ms. Bunosso to provide her feedback on the Experiential Consumption project, this is only possible if Dr. Goodman and Dr. Malkoc-Goodman use data collected and analyzed during Ms. Bunosso's tenure on the project in the main article and/or if the framework discussed during Ms. Bunosso's tenure is used as the main conceptual framework.

123. That same day, Ms. Bunosso's legal counsel sent the written agreement to CRCO so the no-contact directives could be modified between Ms. Bunosso, Dr. Malkoc-Goodman and Dr. Goodman to allow for limited communication to allow Ms. Bunosso to finally continue her research work.

124. CRCO did not modify the no-contact directives until September 13, 2024.

125. As a result, Ms. Bunosso lost four months of research time because CRCO did not modify the no-contact directives when Ms. Bunosso first asked.

**Other Acts of Retaliation Against Ms. Bunosso By the Defendants**

*The 2023-2024 Academic Year*

126.    Students in the Program were required to be enrolled in an Independent Study course every semester to maintain their enrollment.

127.    The Independent Study course was automatically created for each student and then each student was automatically enrolled.

128.    Before Ms. Bunosso began filing complaints with CRCO, the Independent Study course was automatically created for Ms. Bunosso, and she was then automatically enrolled.

129.    After Ms. Bunosso filed her first complaint with CRCO on March 1, 2023, she stopped being automatically enrolled in the Independent Study course.

130.    Throughout spring 2023 and fall 2024, Ms. Bunosso had to contact FCB staff and faculty repeatedly to create and enroll her in her Independent Study course for her each semester.

131.    Upon information and belief, no other student in the Program had to independently request creation of, and enrollment in, their Independent Study course.

132.    On or around July 24, 2023, Ms. Bunosso requested the following supportive measures due to continued retaliation by Dr. Malkoc-Goodman and Dr. Goodman:

   a.    An alternative space where she could conduct her weekly research hours outside of the Consumer Behavior Lab to avoid Dr. Goodman and Dr. Malkoc-Goodman;

   b.    Assistance enrolling in an Independent Study course;

   c.    Approval of her Program of Study after Dr. Allenby refused to approve it during her Annual Review in May;

    d. An exemption from the Brown Bag course requirement for the Fall 2023 term because Dr. Malkoc-Goodman was coordinating with and evaluating all students in the course; and

    e. Permission to give a required presentation to the DML virtually rather than in person to avoid contact with her harassers.

133. On or around July 27, 2023, Dr. Allenby denied Ms. Bunosso's requests.

134. This denial meant that Ms. Bunosso would be forced to perform and present her research in an environment rife with systemic abuse and ongoing retaliation, to be evaluated by faculty members engaging in an active campaign of retaliation against her, and to continue to depend on her harassers to fulfill Program requirements.

135. On or around September 15, 2023, FCB faculty finally approved Ms. Bunosso's Program of Study, one and a half years after she first began seeking approval.

136. Upon information and belief, no other graduate student in the Program has had to wait that long for faculty to approve their Program of Study.

137. Because of the significant delay in approval of her Program of Study, Ms. Bunosso was denied the following opportunities provided to all other students in her Program:

    a. The ability to take the Candidacy Exam when she was otherwise ready to do so and on the schedule that worked best for her; and

    b. The ability to enroll in the courses she wanted on the schedule she needed, forcing her to take certain courses at inopportune times while she was simultaneously focused on other program requirements, limiting her ability to benefit from both the courses and the other program requirements.

138.     Visiting researchers at FCB participate in lunches/dinners and meetings with select faculty members and a breakfast with the Program students in their concentration.

139.     These breakfasts allow for students and visiting researchers to connect, converse, and network.

140.     On or around September 14 and 15, 2023, the Department hosted the first Consumer Behavior researcher of the semester.

141.     Ms. Bunosso and Jane Doe were not invited to participate in the student breakfast with the researcher.

142.     Upon information and belief, Ms. Bunosso and Jane Doe were the only Consumer Behavior students who were not invited to participate in this breakfast.

143.     The Department hosts external researchers weekly.

144.     During their visits, these researchers present their research to the Department's faculty and students. These presentations are called "Brown Bags" and attendance was a required component of FCB graduate students' academic work.

145.     In May 2023, because Dr. Malkoc-Goodman was responsible for coordinating the Brown Bags, OSU approved Ms. Bunosso to attend them virtually as a supportive measure so she did not have to encounter Dr. Malkoc-Goodman while the CRCO investigation was ongoing and subject herself to further risk of retaliation.

146.     However, the Department failed to provide Ms. Bunosso with virtual access to the Brown Bags until late September 2023.

147.     As a result, Ms. Bunosso missed four of thirteen Brown Bag presentations in the Fall 2023 semester.

148.     Upon information and belief, no other Program students were excluded from the Brown Bag presentations.

149.     As outlined in Jane Doe's CRCO complaint, Ms. Bunosso and Jane Doe  were also excluded from participating in breakfasts with visiting faculty.

150.     Ms. Bunosso remained excluded from the breakfasts throughout the entire Fall 2023 semester.

151.     Exclusion from the Brown Bags and breakfasts denied Ms. Bunosso the opportunity to learn from and network with other professionals in her field and the opportunity to engage with and network with these professionals.

152.     During the 2023-2024 school year, Dr. Malkoc-Goodman and Dr. Goodman continued to retaliate against Ms. Bunosso by excluding her from the Experiential Consumption project and by using her work without properly crediting her.

153.     On or around March 29, 2024, Dr. Malkoc-Goodman gave a presentation at the University on the Experiential Consumption project.

154.     Ms. Bunosso attended the presentation virtually.

155.     Immediately upon entering the virtual presentation, Ms. Bunosso noticed that Dr. Malkoc-Goodman had not credited her as an author.

156.     Dr. Malkoc-Goodman, Dr. Goodman, and Dr. Walker were listed as coauthors.

157.     Shortly after Ms. Bunosso entered the meeting, Dr. Malkoc-Goodman quickly modified her presentation slides to delete Dr. Goodman and Dr. Walker's names.

158.     On or around April 15, 2024, Dr. Walker informed Ms. Bunosso that he had told Dr. Malkoc-Goodman and Dr. Goodman that he did not want his name affiliated with the

Experiential Consumption project anymore because he did not want to be complicit in plagiarizing Ms. Bunosso's work.

159.     Dr. Walker also said, during the authorship dispute investigation, he had told Dean Makhija and the investigation committee that Dr. Malkoc-Goodman and Dr. Goodman were not doing new and distinct research and instead were using Ms. Bunosso's research.

160.     Despite this, Dean Makhija's report falsely stated that Dr. Malkoc-Goodman and Dr. Goodman were working on new research that was distinct from Ms. Bunosso's work.

161.     Based on this information, on April 18, 2024, Ms. Bunosso filed a complaint of plagiarism against Dr. Malkoc-Goodman and Dr. Goodman with then-Associate Vice President for Research Compliance Susan Garfinkel.

162.     On April 26, 2024, Dr. Garfinkel dismissed the plagiarism complaint without investigation, wrongly characterizing the plagiarism complaint as indistinguishable from the authorship dispute.

163.     In her dismissal, Dr. Garfinkel wrote:

> Based on university policies, I do not see anything else that can be done by the university. In most data disputes, we stress the importance of getting all parties involved to be flexible and find a fair compromise. I'm sorry this has not worked out for you, and I hope you find a way to work with Drs. Malkoc[-Goodman] and Goodman to find an acceptable outcome.

164.     Dr. Garfinkel's letter provided Ms. Bunosso with no information or advice on how to convince two senior faculty members with significant power and control over her who were committed to a course of incessant retaliation against her to "find a way to work with" her.

165.     On or around May 3, 2024, Dr. Goodman announced that Dr. Allenby would be co-chairing the Brown Bags for the upcoming 2024-2025 academic year.

166.     This was a direct violation of Dr. Allenby's CRCO sanctions, as it would place him in a position to directly evaluate and communicate with Ms. Bunosso, as the Brown Bags became a program requirement.

167.     Upon information and belief, Dr. Allenby was not required to teach the Brown Bag course and could fulfill his teaching obligations by teaching courses that did not involve Ms. Bunosso.

168.     On May 13, 2024, Ms. Bunosso emailed Dean of the John Glenn Public Affairs Program Trevor Brown, who had issued the sanctions against Dr. Allenby, and notified him that Dr. Allenby's participation in the Brown Bags would violate the sanctions.

169.     Dean Brown told Ms. Bunosso that Dr. Allenby had appealed the sanctions and therefore, the sanctions would not be implemented while the appeal was pending.

170.     No one at OSU had notified Ms. Bunosso of the appeal or offered her the opportunity to respond to it, in violation of 34 C.F.R. § 106.45(b)(8)(iii)(a).

171.     Ms. Bunosso then went to Dr. Donnelly with her concerns.

172.     Rather than restricting Dr. Allenby's participation, Dr. Donnelly excused Ms. Bunosso from the Brown Bag requirement for the Fall 2024 semester, denying her equal access to her education as compared to her similarly situated peers.

173.     Students in the Program are expected to attend the Association for Consumer Research ("ACR") conference and the Society for Consumer Psychology ("SCP") conference each year.

174.     In May 2024, Ms. Bunosso attempted to coordinate her attendance at the SCP conference in June 2024 with FCB faculty and administrators.

175.     The Department required that Ms. Bunosso use a grant request process for funding to attend the conference since she was not presenting her research.

176.     Ms. Bunosso could not present her research at the conference because of Dr. Malkoc-Goodman and Dr. Goodman's ongoing retaliation and interference with her research projects.

177.     To secure funding, Ms. Bunosso was required to write and submit an essay and grant proposal.

178.     Upon information and belief, no other students have ever been required to complete these steps to attend a conference.

179.     Upon information and belief, Dr. Goodman continued to retaliate against Ms. Bunosso by excluding her from important communications regarding the conferences.

180.     There are typically only four to six Consumer Behavior students in the Program at a time.

181.     Other Consumer Behavior students have isolated Ms. Bunosso and refused to interact with her since she filed her complaints with CRCO.

182.     In the CRCO investigative report, Ms. Bunosso learned that Dr. Malkoc-Goodman and Dr. Goodman told students that they think Ms. Bunosso filed her complaints against them because she "just doesn't want to do any work."

183.     On or around July 1, 2024, Ms. Bunosso was in the Consumer Behavior student office with two other students, one of whom refused to acknowledge her presence.

184.     Ms. Bunosso has experienced isolation from her cohort and continues to suffer reputational and educational harm due to Dr. Malkoc-Goodman and Dr. Goodman's false statements about her to other students.

185.    Ms. Bunosso initially requested that a no-contact directive be implemented against Dr. Reczek to prohibit Dr. Reczek from attempting to pressure Ms. Bunosso from withdrawing her complaint against Dr. Reczek.

186.    On or around July 3, 2024, Ms. Bunosso asked CRCO to terminate the no-contact directive because she needed to be able to communicate with Dr. Reczek to fully participate in her educational program.

187.    On or around August 7, 2024, CRCO informed Ms. Bunosso that Dr. Reczek did not want to modify the no-contact directive, and it refused to terminate it.

188.    Pursuant to 34 C.F.R. § 106.30(a), Title IX supportive measures are defined as follows:

> Supportive measures means non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the complainant or the respondent before or after the filing of a formal complaint or where no formal complaint has been filed. Such measures are designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter sexual harassment. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

189.    Dr. Reczek has never raised any concern about safety or sexual harassment with respect to Ms. Bunosso, nor has she ever alleged that Ms. Bunosso was limiting her access to OSU's education programs or activities; therefore, neither Title IX itself nor OSU's Title IX policy entitle her to a no-contact directive against Ms. Bunosso.

190.    According to OSU's Title IX policy, supportive measures "are designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the recipient's educational environment, or deter discrimination, harassment, and sexual misconduct."

191.    In addition to Dr. Reczek never alleging a concern of safety, discrimination, harassment, or discrimination against Ms. Bunosso, the ongoing no-contact directive unreasonably burdens Ms. Bunosso; therefore, OSU's Title IX policy does not entitle Dr. Reczek to a no-contact directive against Ms. Bunosso.

192.    Ms. Bunosso dare not risk violating the no-contact directive, as, according to the Title IX policy, the penalties for doing so are severe: "A finding of a policy violation will result in a remedy, which may include corrective action/sanctions…. When the respondent is a student, potential sanctions include formal reprimand, disciplinary probation, suspension, dismissal, and other appropriate educational sanctions."

193.    The no-contact directive remains in place to this day, and through it, OSU has been unlawfully limiting Ms. Bunosso's right to free speech and association and her access to her educational program for over a year.

*The 2024-2025 Academic Year*

194.    Because of the ongoing retaliation by Dr. Malkoc-Goodman and Dr. Goodman, on or around October 22, 2024, Ms. Bunosso requested that, as a supportive measure, she be allowed to continue her education remotely, as she had fulfilled all in-person requirements, despite the additional isolation this caused.

34

195.     By working remotely, Ms. Bunosso lost the important educational opportunity of working alongside her fellow students and has become further isolated from her peers. This isolation will have career-long professional ramifications, including losing the ability to fully collaborate with Dr. Donnelly and other faculty members, due to her inability to attend in-person educational and professional events at the University.

196.     The Department had historically covered travel, lodging, and per diem expenses for all graduate students for program-related conferences and events.

197.     After Ms. Bunosso filed her initial CRCO complaint, the Department imposed a new and extensive process to seek conference-related funding on her, requiring her to complete numerous forms, provide proof of acceptance, write essays justifying her trip, and submit pre-trip authorization requests.

198.     Upon information and belief, no other Program student was required to go through the same rigorous process to receive conference funding.

199.     The University's Marketing PhD Program is invited to send students to the three top doctoral consortiums in the field each year: the American Marketing Association-Sheth Foundation Doctoral Consortium ("Sheth Consortium"), the Indiana University Albert Haring Symposium for Doctoral Research in Marketing ("Haring Symposium"), and the University of Nebraska Mittelstaedt & Gentry Doctoral Symposium ("Mittelstaedt Symposium").

200.     The 2025 Sheth Consortium was held June 25-28, 2025, and was hosted by OSU in Columbus, Ohio.

201.    Each institution that participates in the Sheth Consortium is permitted to send one doctoral candidate student to the consortium; however, because there are 120 maximum spots, additional "exceptional" students may be invited.

202.    OSU sent two students to the Sheth Consortium in 2020.

203.    The Haring Symposium was held April 11-12, 2025.

204.    OSU typically sends two students to the Haring Symposium per year.

205.    The Mittelstaedt Symposium was held April 3-5, 2025.

206.    OSU typically sends two students to the Mittelstaedt Symposium per year.

207.    Every Program student is expected to attend the Sheth Consortium, the Haring Symposium, and the Mittelstaedt Symposium at least once prior to going on the job market.

208.    The student who is selected to attend these events each year is determined by seniority.

209.    Occasionally, the Consumer Behavior/Quantitative Modeling distinction can play a role such that the Program attempts to alternative between both sections when selecting the student to attend; however, seniority takes precedent.

210.    Upon information and belief, no senior student has ever been overlooked because the Program was taking turns between the Consumer Behavior and Quantitative Modeling sections.

211.    At the start of the Spring 2025 semester, Ms. Bunosso had not yet attended the Sheth Consortium, the Haring Symposium, or the Mittelstaedt Symposium.

212.    Ms. Bunosso should have been selected for the Haring Symposium in 2024 as she was the most senior student in the Program at that time; however, two of Dr. Allenby's students were selected to attend instead.

213. These two students were both junior to Ms. Bunosso. In fact, these two students were first- and second-year students at the time, which is unusually junior for the selection.

214. One of these students was also selected to attend the Mittelstaedt Symposium in 2023 despite only being a first-year student at the time.

215. Ms. Bunosso should have automatically been selected to attend the Sheth Consortium, the Haring Symposium, and the Mittelstaedt Symposium in 2025 because she is the most senior student in the Program and will be the next student to go on the job market.

216. Dr. Donnelly told Ms. Bunosso that, or around August 27, 2024, Dr. Reczek initially told him that the invitations for the 2025 Mittelstaedt Symposium would "definitely" be given to two Quantitative Modeling students, and the Sheth Consortium 2025 invitation would also likely be given to a Quantitative Modeling student, because the Program was trying to take turns between Consumer Behavior and Quantitative Modeling.

217. The most senior Quantitative Modeling student was junior to Ms. Bunosso and had already attended the Mittelstaedt Symposium once.

218. Dr. Donnelly said, sometime in August or September 2024, Dr. Reczek had told him that if Ms. Bunosso wanted to attend these events, she would need to extend her enrollment for a sixth year in the Program, delaying her graduation further.

219. Ms. Bunosso is the most senior student in the Program and had not yet attended any of the conferences, making her the appropriate student to attend all three 2025 events.

220. On or around October 28, 2024, Ms. Bunosso learned that she had been selected to attend the 2025 Sheth Consortium.

221. On or around November 12, 2024, Ms. Bunosso learned that she had been selected to attend the 2025 Haring Symposium.

222. Upon information and belief, if Ms. Bunosso had not filed CRCO complaints against Department faculty, her attendance at each of these events would have been automatically guaranteed, as it was for every other student in the Program.

223. Instead, Dr. Donnelly had to petition the PhD Committee for Ms. Bunosso to be selected for both the Sheth Consortium and the Haring Symposium – a requirement that, upon information and belief, had never been placed upon any other Department student, including the junior students who attended conferences in recent years.

224. Ms. Bunosso was not invited to the Mittelstadt Symposium

225. OSU's failure to invite Ms. Bunosso to attend the Mittelstadt Symposium when it is customary for all students to attend and when she should otherwise be selected denied her a professional opportunity offered to all other students in the Program.

226. OSU was selected to host the 2025 Sheth Consortium.

227. Each year, the Sheth Family Foundation selects a limited number of graduate students to receive fellowships to attend the Sheth Consortium.

228. Sheth Fellows network with the top doctoral students from business schools in the United States, Canada, and Europe.

229. The Sheth Consortium offers unique opportunities for doctoral students to explore a diversity of topics, methodological perspectives, and theories in the marketing discipline.

230. A critical component of the Sheth Consortium is the support offered to those students seeking to transition to a first faculty position by providing guidance on research, teaching, and service.

231.     This year, Ms. Bunosso was selected as a Sheth fellow.

232.     In June 2025, Ms. Bunosso was living in Connecticut and participating in the Program virtually to avoid contact with her abusers, so she had to travel to Columbus, Ohio to attend the Sheth Consortium.

233.     Upon information and belief, OSU had always paid these expenses for students selected as Sheth fellows to attend the Sheth Consortium and had approved funding for Sheth fellows to attend the Sheth Consortium when it had been held in London, Manchester, Norway, and Texas in prior years.

234.     On or around March 17, 2025, Ms. Bunosso emailed Dr. Walter Zinn, as the new DML Chair, and requested reimbursement for travel, lodging, and per diem expenses for meals for the 2025 Sheth Consortium.

235.     That same day, Dr. Zinn denied Ms. Bunosso's request for funding, rationalizing that because the University was hosting the Consortium, it did not need to cover these expenses for students.

236.     For the next three months, Ms. Bunosso communicated repeatedly with multiple FCB faculty and administrators to request reimbursement for Sheth Consortium, explaining that the reason she was not physically located in Columbus was because she had requested and received a supportive measure to allow her to work and attend classes remotely because of the ongoing Title IX and retaliation against her by FCB faculty.

237.     FCB employees repeatedly denied the reimbursement requests.

238.     As a result, Ms. Bunosso was forced to pay for her own travel, lodging, and meals to attend the Sheth Conference, which, upon information and belief, was something no other OSU Sheth Fellow had ever had to do.

239. Although Ms. Bunosso attended the 2025 Sheth Consortium, she did not receive the same experience and benefits from the event compared to her peers.

240. At the Sheth Consortium, accompanying OSU faculty customarily introduce the selected student to other distinguished scholars who are in attendance for networking.

241. Because OSU was hosting the 2025 Sheth Consortium, all the Program's research faculty were in attendance.

242. Therefore, Ms. Bunosso should have had strong in-person endorsement from the entire department, most importantly senior faculty.

243. Because the no-contact directives were necessary to prevent further harassment and retaliation by Dr. Malkoc-Goodman, Dr. Goodman, and Dr. Allenby, Ms. Bunosso wanted the no-contact directives to remain in place. However, because of the no-contact directives, Dr. Allenby, Dr. Malkoc-Goodman, and Dr. Goodman avoided Ms. Bunosso at the Sheth Consortium and provided her no support or endorsement.

244. Because OSU refused to lift the no-contact directive between Dr. Reczek and Ms. Bunosso even though her CRCO investigation had ended, she also avoided Ms. Bunosso and provided her no support or endorsement.

245. Dr. Donnelly, an associate professor, was the only FCB faculty member who conversed with, endorsed, and introduced Ms. Bunosso to visiting faculty and students.

246. Because Dr. Allenby, Dr. Reczek, Dr. Malkoc-Goodman, and Dr. Goodman, all senior FCB faculty, noticeably disassociated themselves from Ms. Bunosso during the Sheth Consortium, Ms. Bunosso's reputation in her field was irreparably damaged.

247. Many visiting faculty and staff initially did not know that Ms. Bunosso was OSU's selected Sheth fellow.

248.     Because it is customary for universities to only send one student to the Sheth Consortium, it was unusual that other Program students, including those two years junior to Ms. Bunosso, fully participated and networked during the 2025 Sheth Consortium as well, despite not being Sheth fellows.

249.     Dr. Allenby, Dr. Reczek, Dr. Malkoc-Goodman, and Dr. Goodman did interact with those students.

250.     Therefore, it was glaringly obvious to all Sheth Conference attendees that Ms. Bunosso was unwelcome within her own academic program, which will forever tarnish her professional reputation.

251.     On average, Program students graduate in four to six years. Graduation is dependent on completion of the Program requirements, which is at the discretion of the student's primary advisor.

252.     At the time she began her Program of Study, Ms. Bunosso planned to graduate in May 2025, which Dr. Donnelly supported.

253.     Ms. Bunosso worked diligently and successfully completed most of her graduation requirements ahead of schedule.

254.     In or around December 2023, Ms. Bunosso and Dr. Donnelly discussed the possibility of Ms. Bunosso proposing and defending her dissertation early in the Spring 2024 semester with expected graduation in May 2024.

255.     Dr. Malkoc-Goodman and Dr. Goodman refused to allow Ms. Bunosso to use the Experiential Consumption project to meet her graduation requirements.

256.     Because the University refused to require that Dr. Malkoc-Goodman and Dr. Goodman allow Ms. Bunosso to continue working on the Experiential Consumption

project despite Dean Makhija's recommendation, there was no ability to appeal this decision.

257.     Ms. Bunosso is now limited to a one-essay dissertation.

258.     Typically, Program students go on the job market one year before their graduation date.

259.     To be competitive in the job market, it is customary for students in the field to submit a project for journal publication, and have additional papers in late-stage revisions, and have additional papers that are considered works in progress whereby the initial data is being collected.

260.     Even though Ms. Bunosso can submit her Political Policies project for journal publication, she does not have the additional papers and projects in later stages necessary to be competitive in the job market, delaying her ability to move forward with her career.

261.     To be competitive and successful on the job market, it is customary for students to work with two full professors; however, Dr. Reczek, Dr. Malkoc-Goodman, and Dr. Goodman are the only full professors in the Department.

262.     In around March 2024, the Program hired two new assistant professors, including Dr. Jimin Nam.

263.     On or around June 20, 2024, Dr. Donnelly invited Ms. Bunosso to join a research project with him and Dr. Nam.

264.     Dr. Donnelly told Ms. Bunosso that, around August 20, 2024, Dr. Nam had told Dr. Donnelly that Dr. Reczek had instructed Dr. Nam not to collaborate with students on projects during her first year as a professor.

265.     Dr. Reczek knew Ms. Bunosso's options of faculty with whom she could collaborate on research were almost nonexistent, and, upon information and belief, Dr. Reczek provided Dr. Nam with no reasonable explanation for this prohibition.

266.     In or around April 2025, Dr. Nam began collaborating with Ms. Bunosso and Dr. Donnelly on a research project.

267.     In or around May 2025, Dr. Nam left OSU for a position at the Massachusetts Institute of Technology.

268.     By prohibiting Dr. Nam from working with students, Dr. Reczek obstructed Ms. Bunosso's progress in the Program.

269.     Ms. Bunosso now does not expect to graduate until 2027 at the earliest, a two-year delay from her initial plan of graduating in May 2024; however, Ms. Bunosso's graduation is dependent on continuing to successfully meet the requirements of the Program while being subject to her harassers.

270.     Rather than start her career, Ms. Bunosso must continue in the Program and remain vulnerable to further retaliation, so she can attempt to be competitive on the job market at some point.

271.     Due to the ongoing discrimination, harassment, and retaliation, Ms. Bunosso has suffered physical, emotional, and psychological symptoms, including hypervigilance, intrusive thoughts, panic episodes, and prolonged depressive periods that affect her sleep, focus, and overall functioning. She has been diagnosed with post-traumatic stress disorder, anxiety, and depression. She lost confidence, motivation, and joy in the work that she used to love, and she struggles daily to recover a fraction of the drive that she had when she first

started the Program. She has taken on significant additional costs, and her progress in her

degree program has been delayed by several years, if she is ever able to graduate at all.

**COUNT I**
**Title IX Retaliation**
**20 U.S.C. § 1681, *et seq.***
**(The OSU Defendants and Defendants Malkoc-**
**Goodman, Goodman, Reczek,**
**Allenby, and Mayhan)**

272.     Ms. Bunosso realleges and incorporates by reference the allegations contained in

the previous paragraphs.

273.     Ms. Bunosso alleges violations of Title IX against Defendants due to retaliation.

274.     Defendants operate programs in receipt of federal funds and are thus subject to Title

IX's prohibition on sex-based discrimination.

275.     Unlike general claims of Title IX violations, which must be made against recipients

of federal funding, retaliation claims may be brought against both recipients and

individuals:

> No recipient or other person may intimidate, threaten, coerce, or
> discriminate against any individual for the purpose of interfering
> with any right or privilege secured by title IX or this part, or because
> the individual has made a report or complaint, testified, assisted, or
> participated or refused to participate in any manner in an
> investigation, proceeding, or hearing under this part. Intimidation,
> threats, coercion, or discrimination, including charges against an
> individual for code of conduct violations that do not involve sex
> discrimination or sexual harassment, but arise out of the same facts
> or circumstances as a report or complaint of sex discrimination, or a
> report or formal complaint of sexual harassment, for the purpose of
> interfering with any right or privilege secured by title IX or this part,
> constitutes retaliation.

34 C.F.R. § 106.71(a).

276.     Ms. Bunosso engaged in protected activity by reporting sex-based discrimination and retaliation perpetrated against her by Defendants Malkoc-Goodman, Goodman, Reczek, and Allenby to Dr. Reczek and CRCO.

277.     Ms. Bunosso's actions were protected by the anti-retaliation provision of Title IX. 34 CFR § 106.71(a).

278.     Defendants took adverse action against Ms. Bunosso because she made reports of sex discrimination and retaliation, including but not limited to the following:

a.  The OSU Defendants retaliated against Ms. Bunosso by failing to ensure its employees did not continue abusing her once it was put on notice of her concerns of sex discrimination and retaliation; refusing Ms. Bunosso's reasonable supportive measures and accommodations requests; failing to protect Ms. Bunosso from known ongoing retaliation, harassment, and abuse; refusing to enforce Dean Makhija's recommendations; refusing to enforce OSU's own sanctions against Dr. Allenby; failing to provide Ms. Bunosso with timely virtual access to the Brown Bags; failing to ensure Ms. Bunosso was provided with equal access to important educational opportunities; dismissing her plagiarism complaint against Dr. Malkoc-Goodman without investigation; failing to timely terminate no-contact directives against her; maintaining an inappropriate and unlawful no-contact directive against her; failing to intervene to prevent Ms. Bunosso's loss of several research projects; creating additional obstacles and barriers applicable only to Ms. Bunosso to thwart her access to educational programs and opportunities.

b.  Dr. Malkoc-Goodman retaliated against Ms. Bunosso by excluding her from her Political Policies and Experiential Consumption projects; making false reports of

discrimination, harassment, and retaliation against Ms. Bunosso; interfering with Ms. Bunosso's access to FCB events; creating a hostile environment for Ms. Bunosso, forcing her to move to virtual education; plagiarizing Ms. Bunosso's work and calling it her own; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

c. Dr. Goodman retaliated against Ms. Bunosso by delaying approval of her Program of Study; excluding Ms. Bunosso from her Experiential Consumption project; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; creating a hostile environment for Ms. Bunosso by forcing her to move to virtual education; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

d. Dr. Reczek retaliated against Ms. Bunosso by soliciting Dr. Allenby and other faculty members to pressure Ms. Bunosso into withdrawing her CRCO complaint, demanding that OSU maintain a no-contact directive against Ms. Bunosso even though she had never reported any safety or discrimination concerns against Ms. Bunosso, and failing to promote Ms. Bunosso at the Sheth Consortium, and prohibiting Dr. Nam from working with Ms. Bunosso.

e. Dr. Allenby retaliated against Ms. Bunosso by encouraging her to withdraw her CRCO complaint against Dr. Reczek and expressing bias against her for filing complaints against his colleagues.

f. Ms. Mayhan retaliated against Ms. Bunosso by failing to ensure CRCO completed its investigations in a timely manner, failing to timely terminate no-contact directives against Ms. Bunosso, and maintaining an inappropriate and unlawful no-contact directive against Ms. Bunosso.

## COUNT II
### As-Applied Violation of Right to Freedom of
### Speech and Association
### 42 U.S.C. § 1983 and the First and Fourteenth
### Amendments to the U.S. Constitution
### (Defendants Reczek and Mayhan)

279. Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

280. Defendants were state actors and at all relevant times acted under color of law.

281. The requirements of the First Amendment are applied to the states and state actors through the due process clause of the Fourteenth Amendment of the U.S. Constitution.

282. As Title IX Coordinator, Defendant Mayhan was responsible for ensuring that supportive measures were not disciplinary or punitive in nature, were not unreasonably burdensome upon Ms. Bunosso, and did not infringe on Ms. Bunosso's legal rights. 34 C.F.R. § 106.30(a).

283. Defendants violated Ms. Bunosso's constitutional rights in the following ways:

a. Dr. Reczek refused to allow CRCO to terminate the no-contact directive against Ms. Bunosso, despite having no basis under the law or OSU policy to maintain it.

b. Ms. Mayhan refused to terminate the no-contact directive between Dr. Reczek and Ms. Bunosso, despite Dr. Reczek having no basis under the law or OSU policy to maintain it.

284. Defendants' actions have explicitly and implicitly chilled Ms. Bunosso's free speech and association and have caused Ms. Bunosso to suffer injuries that would chill a person of ordinary firmness from continuing that speech.

285. Defendants violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Ms. Bunosso under 42 U.S.C. § 1983.

286. Defendants acted intentionally and with callous disregard for Ms. Bunosso's clearly established constitutional rights.

287. The denial of constitutional rights is irreparable injury *per se*, and Ms. Bunosso is entitled to declaratory and injunctive relief.

**COUNT III**
**First Amendment Retaliation**
**Freedom of Speech and Association**
**42 U.S.C. § 1983**
**(The OSU Defendants and Defendants Malkoc-**
**Goodman, Goodman, Reczek,**
**Allenby, and Mayhan)**

288. Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

289. Defendants were state actors and at all relevant times acted under color of law.

290. Ms. Bunosso engaged in constitutionally protected activity by reporting sex-based discrimination and retaliation perpetrated against her by Defendants Malkoc-Goodman, Goodman, Reczek, and Allenby to Dr. Reczek and CRCO.

291. Defendants took adverse action against Ms. Bunosso because she made reports of sex discrimination and retaliation, including but not limited to the following:

a.  The OSU Defendants retaliated against Ms. Bunosso by failing to ensure its employees did not continue abusing her once it was put on notice of her concerns of sex discrimination and retaliation; refusing Ms. Bunosso's reasonable supportive measures and accommodations requests; failing to protect Ms. Bunosso from known ongoing retaliation, harassment, and abuse; refusing to enforce Dean Makhija's recommendations; refusing to enforce OSU's own sanctions against Dr. Allenby; failing to provide Ms. Bunosso with timely virtual access to the Brown Bags; failing to ensure Ms. Bunosso was provided with equal access to important educational opportunities; dismissing her plagiarism complaint against Dr. Malkoc-Goodman without investigation; failing to timely terminate no-contact directives against her; maintaining an inappropriate and unlawful no-contact directive against her; failing to intervene to prevent Ms. Bunosso's loss of several research projects; creating additional obstacles and barriers applicable only to Ms. Bunosso to thwart her access to educational programs and opportunities.

b.  Dr. Malkoc-Goodman retaliated against Ms. Bunosso by excluding her from her Political Policies and Experiential Consumption projects; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; interfering with Ms. Bunosso's access to FCB events; creating a hostile environment for Ms. Bunosso, forcing her to move to virtual education; plagiarizing Ms. Bunosso's work and calling it her own; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

c. Dr. Goodman retaliated against Ms. Bunosso by delaying approval of her Program of Study; excluding Ms. Bunosso from her Experiential Consumption project; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; creating a hostile environment for Ms. Bunosso forcing her to move to virtual education; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

d. Dr. Reczek retaliated against Ms. Bunosso by soliciting Dr. Allenby and other faculty members to pressure Ms. Bunosso into withdrawing her CRCO complaint, demanding that OSU maintain a no-contact directive against Ms. Bunosso even though she had never reported any safety or discrimination concerns against Ms. Bunosso, failing to promote Ms. Bunosso at the Sheth Consortium, and prohibiting Dr. Nam from working with Ms. Bunosso.

e. Dr. Allenby retaliated against Ms. Bunosso by encouraging her to withdraw her CRCO complaint against Dr. Reczek and expressing bias against her for filing complaints against his colleagues.

f. Ms. Mayhan retaliated against Ms. Bunosso by failing to ensure CRCO completed its investigations in a timely manner, failing to timely terminate no-contact directives against her, and maintaining an inappropriate and unlawful no-contact directive against her.

292. Defendants' actions have explicitly and implicitly chilled Ms. Bunosso's free speech and association and have caused Ms. Bunosso to suffer injuries that would chill a person of ordinary firmness from continuing that speech.

293.     Defendants violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Ms. Bunosso under 42 U.S.C. § 1983.

294.     Defendants acted intentionally and with callous disregard for Ms. Bunosso's clearly established constitutional rights.

295.     As a direct and proximate result of Defendants' actions, Ms. Bunosso has suffered and continue to suffer irreparable injury, including being deprived of her constitutional right to free speech and association.

296.     Ms. Bunosso has no other adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to her First Amendment rights.

297.     Without injunctive and declaratory relief, Defendants' suppression of Ms. Bunosso's First Amendment right to report discrimination and retaliation and to free association will continue and she will suffer *per se* irreparable harm indefinitely.

**COUNT IV**
**Denial of Substantive Due Process**
**and Equal Protection**
**42 U.S.C. § 1983 and the Fourteenth Amendment**
**to the U.S. Constitution**
**(Defendants Malkoc-Goodman, Goodman,**
**Reczek, Allenby, and Mayhan)**

298.     Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

299.     Defendants were state actors and at all relevant times acted under color of law.

300.     Ms. Bunosso, a woman, is a member of a protected class.

301.     Ms. Bunosso also enjoys the constitutionally protected substantive due process right to be free from discrimination and retaliation under the Fourteenth Amendment to the U.S. Constitution.

   a.  Dr. Malkoc-Goodman violated Ms. Bunosso's constitutional rights by excluding her from her Political Policies and Experiential Consumption projects; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; interfering with Ms. Bunosso's access to FCB events; creating a hostile environment for Ms. Bunosso, forcing her to move to virtual education; plagiarizing Ms. Bunosso's work and calling it her own; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

   b.  Dr. Goodman violated Ms. Bunosso's constitutional rights by delaying approval of her Program of Study; excluding Ms. Bunosso from her Experiential Consumption project; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; creating a hostile environment for Ms. Bunosso forcing her to move to virtual education; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

   c.  Dr. Reczek violated Ms. Bunosso's constitutional rights by soliciting Dr. Allenby and other faculty members to pressure Ms. Bunosso into withdrawing her CRCO complaint, demanding that OSU maintain a no-contact directive against Ms. Bunosso even though she had never reported any safety or discrimination concerns

against Ms. Bunosso, failing to promote Ms. Bunosso at the Sheth Consortium, and prohibiting Dr. Nam from working with Ms. Bunosso.

d. Dr. Allenby violated Ms. Bunosso's constitutional rights by encouraging her to withdraw her CRCO complaint against Dr. Reczek and expressing bias against her for filing complaints against his colleagues.

e. Ms. Mayhan violated Ms. Bunosso's constitutional rights by failing to ensure CRCO completed its investigations in a timely manner, failing to timely terminate no-contact directives against her, and maintaining an inappropriate and unlawful no-contact directive against her.

302.     Defendants' discrimination and retaliation against Ms. Bunosso on the basis of sex endangered her safety, privacy, security and well-being.

303.     Defendants' actions and inactions deprived Ms. Bunosso of her right to equal dignity, liberty, and autonomy by treating her as a second-class citizen at OSU.

304.     Reasonable officials in Defendants' positions would have known of Ms. Bunosso's rights to substantive due process and equal protection under the law.

305.     Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

## COUNT V
## Failure to Train and Supervise
## 42 U.S.C. § 1983 and the Fourteenth Amendment
## to the U.S. Constitution
## (Defendants Mohler, Carter, Gilliam, Zadnik,
## Bellamkonda, Makhija, and Mayhan)

306.     Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

307.     Defendants were state actors and at all relevant times acted under color of law.

308. As Presidents, Dr. Mohler and Mr. Carter were responsible for training, supervising, disciplining, and correcting high level OSU administrators and employees.

309. As Executive Vice Presidents and Provosts, Drs. Gilliam, Zadnik, and Bellamkonda were responsible for training, supervising, disciplining, and correcting OSU faculty.

310. As Dean of FCB, Dr. Makhija was responsible for training, supervising, disciplining, and correcting FCB faculty.

311. As Title IX Coordinator, Ms. Mayhan was responsible for training, supervising, disciplining, and correcting CRCO staff.

312. Defendants were responsible for training, supervising, disciplining, and correcting faculty and staff regarding the following duties:

   a. Perceiving, reporting, and stopping unlawful discrimination and retaliation at OSU;

   b. Providing diligent supervision over faculty and staff;

   c. Providing a safe environment for all students to OSU's premises free of retaliation;

   d. Properly training faculty and staff to be aware of their individual responsibility for creating and maintaining an environment free of discrimination and retaliation; and

   e. Disciplining and correcting faculty and staff who failed to comply with their duties and obligations.

313. The above list of duties is not exhaustive.

314. Dr. Mohler and Mr. Carter failed to train, supervise, discipline, and correct Drs. Gilliam, Zadnik, Bellamkonda, Makhija, and Ms. Mayhan regarding the aforementioned duties.

315.     Drs. Gilliam, Zadnik, Bellamkonda, Makhija, and Ms. Mayhan's constitutional infringements upon Ms. Bunosso were causally connected to Dr. Mohler and Mr. Carter's failure to train, supervise, discipline, and correct them.

316.     Drs. Gilliam, Zadnik, and Bellamkonda failed to train, supervise, discipline, and correct Dr. Makhija regarding the aforementioned duties.

317.     Dr. Makhija's constitutional infringements upon Ms. Bunosso were causally connected to Drs. Gilliam, Zadnik, and Bellamkonda's failure to train, supervise, discipline, and correct him.

318.     Dr. Makhija failed to train, supervise, discipline, and correct Drs. Malkoc-Goodman, Goodman, Reczek, and Allenby regarding the aforementioned duties.

319.     Drs. Malkoc-Goodman, Goodman, Reczek, and Allenby's constitutional infringements upon Ms. Bunosso were causally connected to Dr. Makhija's failure to train, supervise, discipline, and correct them.

320.     Ms. Mayhan failed to train, supervise, discipline, and correct the CRCO staff handling Ms. Bunosso's CRCO complaints and investigations regarding the aforementioned duties.

321.     CRCO staff's constitutional infringements upon Ms. Bunosso were causally connected to Ms. Mayhan's failure to train, supervise, discipline, and correct.

322.     Defendants' failure to properly train, supervise, discipline, and correct resulted from deliberate indifference.

323.     A reasonable person in Defendants' position would have known their failure to properly train, discipline, and supervise reflected deliberate indifference.

324.     Defendants' actions violated clearly established Constitutional law; thus, they are not entitled to qualified immunity.

**<u>COUNT VI</u>**
**Violation of Title VII**
**Retaliation**
**42 U.S.C. § 2000e, *et seq*.**
**(The OSU Defendants and Defendants Malkoc-**
**Goodman, Goodman, Reczek, and Allenby)**

325.     Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

326.     Ms. Bunosso is an employee within the meaning of Title VII.

327.     OSU is an employer within the meaning of Title VII.

328.     Title VII prohibits employers from retaliating against employees that have made or assisted in claims:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

329.     Ms. Bunosso engaged in protected activity when she repeatedly filed complaints of Defendants Malkoc-Goodman, Goodman, Reczek, and Allenby's discriminatory and retaliatory conduct with CRCO.

330.     At all times relevant, Defendants were aware Ms. Bunosso was engaged in a protected activity.

331.     After reporting discrimination and retaliation to CRCO, Ms. Bunosso suffered adverse employment actions, including but not limited to:

a. The OSU Defendants retaliated against Ms. Bunosso by failing to ensure its employees did not continue abusing her once it was put on notice of her concerns of sex discrimination and retaliation; refusing Ms. Bunosso's reasonable supportive measure and accommodations requests; failing to protect Ms. Bunosso from known ongoing retaliation, harassment, and abuse; refusing to enforce Dean Makhija's recommendations; refusing to enforce OSU's own sanctions against Dr. Allenby; failing to provide Ms. Bunosso with timely virtual access to the Brown Bags; failing to ensure Ms. Bunosso was provided with equal access to important educational opportunities; dismissing her plagiarism complaint against Dr. Malkoc-Goodman without investigation; failing to timely terminate no-contact directives against her; maintaining an inappropriate and unlawful no-contact directive against her; failing to intervene to prevent Ms. Bunosso's loss of several research projects; creating additional obstacles and barriers applicable only to Ms. Bunosso to thwart her access to educational programs and opportunities.

b. Dr. Malkoc-Goodman retaliated against Ms. Bunosso by excluding her from her Political Policies and Experiential Consumption projects; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; interfering with Ms. Bunosso's access to FCB events; creating a hostile environment for Ms. Bunosso, forcing her to move to virtual education; plagiarizing Ms. Bunosso's work and calling it her own; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

57

c. Dr. Goodman retaliated against Ms. Bunosso by delaying approval of her Program of Study; excluding Ms. Bunosso from her Experiential Consumption project; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; creating a hostile environment for Ms. Bunosso forcing her to move to virtual education; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and failing to promote Ms. Bunosso at the Sheth Consortium.

d. Dr. Reczek retaliated against Ms. Bunosso by soliciting Dr. Allenby and other faculty members to pressure Ms. Bunosso into withdrawing her CRCO complaint, demanding that OSU maintain a no-contact directive against Ms. Bunosso even though she had never reported any safety or discrimination concerns against Ms. Bunosso, noticeably snubbing Ms. Bunosso at the Sheth Consortium, and prohibiting Dr. Nam from working with Ms. Bunosso.

e. Dr. Allenby retaliated against Ms. Bunosso by encouraging her to withdraw her CRCO complaint against Dr. Reczek and expressing bias against her for filing complaints against his colleagues.

332. These adverse actions were directly related to the protected activity in which Ms. Bunosso engaged.

333. But for Ms. Bunosso engaging in the protected activity, she would never have experienced the adverse actions to which Defendants have subjected her.

334. As a result of the discriminatory and retaliatory conduct described above, Ms. Bunosso filed a charge with the EEOC.

335.     Ms. Bunosso has exhausted her administrative remedies and received a timely right to sue letter from the Equal Employment Opportunity Commission.

336.     Defendants' unlawful retaliatory conduct constitutes a willful and wanton violation of Title VII, which was outrageous, malicious, intended to injure Ms. Bunosso, and done with conscious disregard of her civil rights.

**COUNT VII**
**Discrimination**
**O.R.C. 4112.01, *et seq*.**
**(The OSU Defendants and Defendants Malkoc-
Goodman, Goodman, Reczek, and Allenby)**

337.     Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

338.     Ms. Bunosso is an employee within the meaning of O.R.C. 4112.01.

339.     OSU is an employer within the meaning of O.R.C. 4112.01.

340.     O.R.C. 4112.02(I) provides that it is an unlawful discriminatory practice:

> For any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice.

341.     Defendants engaged in the following acts of discrimination which constituted aiding, abetting, inciting, compelling, and/or coercing one another to discriminate against Ms. Bunosso and/or obstructing or preventing Ms. Bunosso from proceeding with investigations against Drs. Malkoc-Goodman, Goodman, Reczek, and Allenby:

   a.    The OSU Defendants discriminated against Ms. Bunosso by failing to ensure its employees did not continue abusing her once it was put on notice of her concerns of sex discrimination and retaliation; refusing Ms. Bunosso's reasonable supportive

measure and accommodations requests; failing to protect Ms. Bunosso from known ongoing retaliation, harassment, and abuse; refusing to enforce Dean Makhija's recommendations; refusing to enforce OSU's own sanctions against Dr. Allenby; failing to provide Ms. Bunosso with timely virtual access to the Brown Bags; failing to ensure Ms. Bunosso was provided with equal access to important educational opportunities; dismissing her plagiarism complaint against Dr. Malkoc-Goodman without investigation; failing to timely terminate no-contact directives against her; maintaining an inappropriate and unlawful no-contact directive against her; failing to intervene to prevent Ms. Bunosso's loss of several research projects; creating additional obstacles and barriers applicable only to Ms. Bunosso to thwart her access to educational programs and opportunities.

b. Dr. Malkoc-Goodman discriminated against Ms. Bunosso by excluding her from the Political Policies and Experiential Consumption projects; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; interfering with Ms. Bunosso's access to FCB events; creating a hostile environment for Ms. Bunosso, forcing her to move to virtual education; plagiarizing Ms. Bunosso's work and calling it her own; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and noticeably snubbing Ms. Bunosso at the Sheth Consortium.

c. Dr. Goodman discriminated against Ms. Bunosso by delaying approval of her Program of Study; excluding Ms. Bunosso from the Experiential Consumption project; making false reports of discrimination, harassment, and retaliation against Ms. Bunosso; creating a hostile environment for Ms. Bunosso forcing her to move

to virtual education; refusing to comply with Dean Makhija's recommendations; forcing Ms. Bunosso to give up the Experiential Consumption project; and noticeably snubbing Ms. Bunosso at the Sheth Consortium.

d. Dr. Reczek discriminated against Ms. Bunosso by soliciting Dr. Allenby and other faculty members to pressure Ms. Bunosso into withdrawing her CRCO complaint, demanding that OSU maintain a no-contact directive against Ms. Bunosso even though she had never reported any safety or discrimination concerns against Ms. Bunosso, noticeably snubbing Ms. Bunosso at the Sheth Consortium, and prohibiting Dr. Nam from working with Ms. Bunosso.

e. Dr. Allenby discriminated against Ms. Bunosso by encouraging her to withdraw her CRCO complaint against Dr. Reczek and expressing bias against her for filing complaints against his colleagues.

342. As a result of the discriminatory and retaliatory conduct described above, Ms. Bunosso filed a charge with the EEOC.

343. Ms. Bunosso has exhausted her administrative remedies and received a timely right to sue letter from the Equal Employment Opportunity Commission.

**COUNT VIII**
**Intentional Infliction of Emotional Distress**
**(Defendants Malkoc-Goodman, Goodman,**
**Reczek, and Allenby)**

344. Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

345. Among other failings, Defendants, including those University faculty that are the highest rank in the Program, continued to retaliate against Ms. Bunosso for years after she complained of discrimination and harassment; failed to provide her with equal educational

opportunities as her peers because of her Complaints; removed her from multiple research projects, significantly delaying her graduation; created a hostile and unwelcome environment for Ms. Bunosso culminating in her request to work remotely moving forward.

346. Defendants knew, or should have known, its actions and omissions would result in serious emotional distress to Ms. Bunosso.

347. Defendants' acts and omissions were so extreme and outrageous as to exceed the bounds of decency and are completely intolerable in a civilized society.

## **DAMAGES**

348. Ms. Bunosso realleges and incorporates by reference the allegations contained in the previous paragraphs.

349. As a direct and proximate result of the above-described conduct, Ms. Bunosso suffered general, special, incidental, and consequential injuries and damages, past, present, and future, in excess of the jurisdictional threshold of this Court, an amount that shall be fully proven at the time of trial. These past, present, and future damages include, but are not limited to, the following:

a) Physical injury and suffering;

b) Pain, suffering, and mental and emotional distress;

c) Embarrassment, loss of self-esteem, disgrace, and humiliations;

d) Loss of her constitutional rights;

e) Loss of employment opportunities;

f) Economic loss;

g) Loss of relationships, including key professional relationships;

h) Delay in graduation and future employment prospects;

i) Travel and travel-related expenses;

j) Loss of the ordinary pleasures of everyday life;

k) All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under these circumstances.

## PRAYER FOR RELIEF

For all the foregoing reasons, Ms. Bunosso prays for judgment against Defendants as follows:

A. For past, present, and future non-economic damages in an amount to be determined at trial;

B. For past, present, and future general, special, incidental, and consequential damages in an amount to be determined at trial;

C. For any appropriate statutory damages;

D. For costs of this suit;

E. For punitive damages, according to proof, as appropriate

F. For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

G. Declaratory and injunctive relief;

H. For reasonable attorneys' fees, costs, and interest, to the fullest extent allowed by law; and

I. All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Ms. Bunosso hereby demands a trial by jury of all issues in this case.

Respectfully submitted,

ABDNOUR WEIKER LLP

***/s/ Elizabeth K. Abdnour***
Elizabeth K. Abdnour (0081795)
Jessica N. Moore (0101098)
262 S. Third Street
Columbus, Ohio 43215
T: (614) 745-2001
F: (614) 417-5081
liz@education-rights.com
jessica@education-rights.com

*Attorneys for Plaintiff*